# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ANDREA RICHARDSON,**<br><br>Plaintiff,<br><br>v.<br><br>**DISTRICT OF COLUMBIA, WARDEN WILLIAM SMITH, and JOHN DOES I–X,**<br><br>Defendants. | Case No. 16-cv-209 (CRC) |

## MEMORANDUM OPINION

Plaintiff Andrea Richardson, a transgender woman, claims that she was sexually assaulted by her male cellmate while incarcerated in the District of Columbia jail—specifically, its Central Detention Facility in Southeast D.C. She brought this lawsuit against the District and several jail officials alleging that they failed to protect her from the assault. The defendants have moved for summary judgment on some of her claims, including her claim that the jail officials violated the Eighth Amendment by acting with deliberate indifference toward the risk of her assault.

Richardson's Eighth Amendment claim names, as defendants, Warden William Smith in his individual and official capacities and several unknown jail officials designated as "John Does I–X." Richardson concedes that because she did not identify the John Doe defendants during discovery, her Eighth Amendment claim against them should be dismissed without prejudice. As for Warden Smith: The undisputed facts concerning his role in the alleged assault show that he did not violate Richardson's clearly established constitutional rights. He is therefore entitled to qualified immunity in his individual capacity. And Richardson has offered no evidence that a District policy or practice of ignoring inmates' concerns about the risk of assault caused the

purported Eighth Amendment violation here, as would be required to support her official-capacity claim against Smith. The Court will therefore grant summary judgment on Richardson's Eighth Amendment claim. And because that is her sole federal claim, the Court will remand the rest of the case to the District of Columbia Superior Court.

## I. Background

The District of Columbia's Department of Corrections has a formal policy for housing "transgender, transsexual, inter-sex, and gender variant persons who are incarcerated." Defs.' Mot. Summ. J. Ex. G ("Housing Policy"), at 1. It enacted these protocols in the wake of the Prison Rape Elimination Act of 2003 ("PREA"), 34 U.S.C. §§ 30301–30309, a statute that prompted the creation of national standards for state prisons and jails to take effect in 2012. See 28 C.F.R. §§ 115.11–115.93.

At the time of Richardson's incarceration, the Department's policy provided as follows: When individuals arrived in D.C. jail whose "gender-related expression, identity, appearance, or behavior differ[ed] from their biological sex," those individuals were to be housed alone during the intake process and assessed to determine whether they should be designated as transgender. Housing Policy at 3–4. Inmates designated as transgender then had a right to go before the Transgender Housing Committee within 72 hours of their arrival. Id. at 4–5. The Committee was made up of a physician, a mental health worker, a jail supervisor, a case worker, and a volunteer who is a member of the transgender community or an expert on transgender issues. Id. at 3. In its hearings, the Committee would consider the inmate's "records and assessments, including an interview with the inmate," to decide whether the inmate should be housed in the general male population, the general female population, or "protective custody." Id. at 5. An inmate would be housed in protective custody when there was "reason to believe the inmate

presents a heightened risk to him/herself or to others or where the inmate fears he or she will be vulnerable to victimization in any other housing setting." Id. at 5–6. The protective custody could last "only for the period during which the heightened risk and/or fear exists," id. at 6, a limitation demanded by the PREA, 28 C.F.R. § 115.43; see also id. § 115.42 (barring jails from placing transgender inmates "in dedicated facilities, units, or wings solely on the basis of such identification or status" unless required by consent decree).

The Committee would forward its housing recommendation to the jail's warden for final approval. If the warden disagreed with the Committee's recommendation, he needed to explain his disagreement in writing to the Director of the Department, who then had the power to override the Committee.

Inmates could also waive the right to a hearing by agreeing to be housed with the general population of their biological sex and signing a form to that effect. That is what Richardson did when she arrived at D.C.'s Central Detention Facility in June 2014. At that time, she identified as female and was undergoing hormone therapy in preparation for sex-reassignment surgery. She had fully developed breasts, dressed in traditionally feminine clothing, and wore make-up. In her interactions with inmates and prison employees, she went by Andrea rather than by her legal name, Andre. During her intake, Richardson opted to waive her hearing and to be housed in the general male population, and she signed the required form indicating that. Defs.' Mot. Summ. J. Ex. A. She testified that she made this choice because she believed, based on statements of Committee members, that she was choosing between (1) being celled alone or with another transgender female within the larger male population or (2) being housed "essentially in isolation." Pl.'s Opp'n at 6; see Defs.' Mot. Summ. J. Ex. D ("Richardson Depo."), at 79

3

(Richardson testifying that the Housing Committee told her "that if you wanted to be housed with your sexual expression . . . you would be segregated from everyone else").

Warden William Smith, who had begun his tenure at the Central Detention Facility only a few months before Richardson's arrival, signed off on her decision. He testified in his deposition that he was not particularly aware of Richardson or of any attributes that placed her at a high risk of sexual violence relative to other transgender inmates. Pl.'s Opp'n Ex. 2 ("Smith Depo."), at 25–26, 28–29.

Richardson had her own cell for the first few months of her detention. But on July 18, 2014,[1] following two inmate suicides, the Department's Director ordered that all inmates in the general jail population be required to share cells. Richardson was transferred to a cell with a male inmate, Richard Glover. She testified that as soon as she was told that she was being moved, she explained to a prison guard that she was not supposed to be bunked with men, and she "begged him not to move [her] in a cell with a man." Richardson Dep. at 81.

Richardson alleges that as soon as the two began sharing a cell, Glover began sexually harassing her, groping her, and even telling her that "one day I am going to rape you." Compl. ¶ 15. She says that on several occasions she complained to at least three guards and her case manager about Glover's behavior and asked to be moved to a different cell. Richardson Dep. at 82–88. She also claims to have submitted three written grievances, though no written records of these grievances were produced during discovery. Id. at 84–85.

---

[1] Richardson was sentenced to time served for misdemeanor second-degree theft around this time. But she was held at the jail after her sentencing because she was being investigated for a possible parole violation.

According to Richardson, her complaints were to no avail because on August 25, 2014, Glover raped her. Compl. ¶ 22. Glover purportedly threatened to kill Richardson if she told anyone. Id. ¶ 23. But Richardson told a guard about the attack as soon as she was able. She was taken to a nearby hospital and a rape kit was administered. Glover was later charged in D.C. Superior Court with first degree sexual abuse, kidnapping, and threatening to kidnap or injure a person.

Before the alleged assault, there was no express indication in Glover's record that he posed a high risk of committing sexual abuse. See Defs' Mot. Summ. J. Ex. F, at 4–5. (The jail's policies, consistent with the PREA, require that officials evaluate inmates for a risk of sexual violence and indicate any such risk in their records. See 28 C.F.R. 115.41(e).) A penological expert, however, has opined that because Glover was "a fully sexual functioning male career criminal, who was facing a lengthy stay in federal prison," it was "eminently foreseeable that at some time [he] might sexually assault Ms. Richardson." Pl.'s Opp'n Ex. 3, at 4.

In November 2015, Richardson filed suit in D.C. Superior Court against the District of Columbia, Warden Smith in his individual and official capacities, and ten unknown Department of Corrections employees (designated "John Does I–X") in their individual and official capacities. She brought tort claims under D.C. law for negligence; intentional infliction of emotional distress; negligent infliction of emotional distress; and negligent supervision, retention, and training. She also alleged, pursuant to 42 U.S.C. § 1983, that Warden Smith and the John Doe defendants violated her rights under the Eighth Amendment. The defendants removed the case to federal court on the basis of her federal § 1983 claim. Notice of Removal, ECF No. 2; see 28 U.S.C. § 1441(b).

After discovery, the defendants filed a motion for partial summary judgment. They sought judgment on Richardson's claims for negligent infliction of emotional distress; negligent supervision, retention, and training; and violation of the Eighth Amendment. Richardson agrees that her negligent-supervision claim should be dismissed, Pl.'s Opp'n Mot. Summ. J. at 26, but she opposes summary judgment on the other two claims.

Once the defendants' motion was ripe, the Court directed Richardson to show cause why her claims against the John Doe defendants—who had not been identified during discovery—should not be dismissed. Minute Order (May 18, 2018). Because while a plaintiff "may bring an action against unknown John Doe defendants," she "must substitute named defendants for those unknown defendants after the completion of discovery." Simmons v. District of Columbia, 750 F. Supp. 2d 43, 45 (D.D.C. 2011); see also Newdow v. Roberts, 603 F.3d 1002, 1010 (D.C. Cir. 2010) (explaining that suits against unknown defendants are allowed "only in situations where the otherwise unavailable identity of the defendant will eventually be made known through discovery"). Richardson responded that she had no objection to dismissal without prejudice of her claims against the John Doe defendants. Pl.'s Response to Show Cause Order, ECF No. 48, at 2.

## II. Standard of Review

The Court will grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must accept as true any evidence supporting the party who opposes summary judgment and must draw all reasonable inferences in her favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The opposing party may not,

however, rely on "mere allegations" or conclusory statements. Veitch v. England, 471 F.3d 124, 134 (D.C. Cir. 2006).

### III. Analysis

The Court begins (and ends) with Richardson's Eighth Amendment claim, which she brings under 42 U.S.C. § 1983. Section 1983 provides a cause of action for money damages against any person who "under color of [D.C. law] . . . subjects, or causes to be subjected" another person "to the deprivation of any rights, privileges, or immunities secured by the Constitution."

The reason to start here is that this is Richardson's sole federal claim. Federal courts can exercise supplemental jurisdiction over claims brought under District of Columbia law "that are so related to" federal claims "that they form part of the same case or controversy." 28 U.S.C. § 1367(a). But courts generally exercise supplemental jurisdiction only so long as one federal claim remains live. Id. § 1367(c)(3) (allowing a district court to decline supplemental jurisdiction if it "has dismissed all claims over which it has original jurisdiction"). So if the Court were to grant summary judgment on Richardson's Eighth Amendment claim, it would remand her District-law claims to D.C. Superior Court. See Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 357 (1988); Edmondson & Gallagher v. Alban Towers Tenants Ass'n, 48 F.3d 1260, 1267 (D.C. Cir. 1995).

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." This prohibition has been interpreted to place some restrictions on the government's treatment of prisoners. See Farmer v. Brennan, 511 U.S. 825, 832–33 (1994). As relevant here, it imposes a limited duty on prison officials "to protect prisoners from violence at the hands of prisoners." Id. at 833 (internal quotation omitted). To establish a violation of that duty, a plaintiff must show

7

both that she was "incarcerated under conditions posing a substantial risk of serious harm" and that the defendant official had a "sufficiently culpable state of mind," which is one of "deliberate indifference to inmate health or safety." Id.

"Deliberate indifference" is a high bar. The official being sued must "know[] of and disregard[] an excessive risk to inmate health or safety." Farmer, 511 U.S. at 837. For an official to know of a risk, he "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. Subjective knowledge of a risk can be proven through circumstantial evidence indicating that the risk was so obvious that the official *must* have known of it. Id. at 842. "[F]or example, if a risk has been 'longstanding, pervasive, well-documented, or noted by prison officials in the past,' and if the defendant official 'had been exposed' to that information, a factfinder could infer that the official had actual knowledge of the risk." Doe v. District of Columbia, 215 F. Supp. 3d 62, 76 (D.D.C. 2016) (quoting Farmer, 511 U.S. at 842–43). By contrast, it is not enough to show that the prison official *should have* been aware of a risk. Farmer, 511 U.S. at 844. And even officials who were subjectively aware of a substantial risk to inmate safety "may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Id. at 844.

Again, Richardson brings her Eighth Amendment claim against Warden Smith and ten "John Doe" prison employees. She concedes that because the identities of the Doe defendants were not established during discovery, the Court should dismiss her claims against the Doe defendants without prejudice. The Court will do so, but only with respect to her Eighth Amendment claim, as that is the only claim being resolved here.

This leaves Warden Smith. Richardson nominally sues Smith in both his individual and official capacities. Compl. ¶ 5; id. at 14 (Count Four). The defendants raise a threshold issue of whether Richardson adequately pled an official-capacity claim. Before turning to that contention, however, the Court will address whether her claim against Smith in his individual capacity—which the defendants concede was adequately pled—survives summary judgment.

   *1. Individual Capacity*

A § 1983 claim against an officer in his individual capacity is a claim that the officer personally caused a deprivation of the plaintiff's constitutional rights. See Kentucky v. Graham, 473 U.S. 159, 165–66 (1985). Richardson claims that Warden Smith acted with deliberate indifference under three basic theories. First, that he "fail[ed] to properly assess" that Michael Glover would pose a high risk of sexual assault and then failed to remove him from Richardson's cell after she complained repeatedly about his sexually aggressive comments and behavior. Compl. ¶ 51. Second, that he failed "to initiate a policy" requiring transgender female inmates to be housed alone or with transgender or gay male inmates. Id. ¶ 52. And, third, that he allowed "a hostile environment to thrive" in the unit where Richardson was housed by allowing guards to taunt Richardson, which contributed to the risk of her being assaulted. Id. ¶ 53.

In the Court's view, the record would not support a jury finding of deliberate indifference under the first and last of these theories. As a matter of undisputed fact, Warden Smith was not responsible for determining inmates' risk of committing sexual assault, and there is no evidence in the current record that Smith was aware of concerns about Glover that Richardson purportedly relayed to several guards. Thus, no reasonable jury could find that he had subjective knowledge of Glover's particular risk of sexual assault and kept Richardson in his cell notwithstanding that knowledge, as would be required to support a determination of deliberate indifference under her

9

first theory of liability. As to Richardson's allegation that Smith maintained a hostile environment that contributed to her risk of being assaulted, she has offered no evidence that Smith ever observed or otherwise had knowledge of said environment, and it is well established that a plaintiff may not hold a supervisor liable under § 1983 based solely on his status as a supervisor—*i.e.*, under a *respondeat superior* theory of liability. Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009).

On the other hand, the record more plausibly supports Richardson's second theory: that Warden Smith acted with deliberate indifference by failing to prevent transgender female inmates from being housed with heterosexual male inmates, period. But the Court finds that, even if the Eighth Amendment barred Smith from allowing Richardson to be housed with male inmates generally, he is entitled to qualified immunity on a claim to that effect.

The defense of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions" by "protect[ing] 'all but the plainly incompetent or those who knowingly violate the law.'" Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). More specifically, qualified immunity requires dismissal of a damages suit against an officer in his individual capacity under § 1983 unless the plaintiff shows that (1) the officer violated her constitutional rights and (2) the unlawfulness of the officer's conduct "was 'clearly established at the time.'" District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018) (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012).

"'Clearly established' means that, at the time of the officer's conduct, the law was 'sufficiently clear' that every 'reasonable official would understand that what he is doing' is unlawful." Wesby, 138 S. Ct. at 589 (quoting Ashcroft, 563 U.S. at 735). "[T]he clearly

10

established law must be 'particularized' to the facts of the case." White v. Pauly, 137 S. Ct. 548, 552 (2017) (per curiam) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). While "general statements of the law are not inherently incapable of giving fair and clear warning to officers," any preexisting law must make the unlawfulness of their conduct "apparent." Id. (internal quotation and citations omitted).

It may seem odd to speak of qualified immunity in the context of the Eighth Amendment. After all, to hold an officer liable for deliberate indifference, a court must find that the officer disregarded a risk of harm that he subjectively knew about. Moreover, it was clearly established in Farmer v. Brennan that disregarding a risk of inmate-on-inmate sexual assault amounts to unconstitutional deliberate indifference. So if the record were to support a jury finding that Warden Smith disregarded the risk that an inmate like Richardson might be assaulted if placed in a cell with a heterosexual male, wouldn't the record *necessarily* also support a finding that Smith violated clearly established law?

Not necessarily. Farmer put correctional officers on notice that they cannot house together a transgender female inmate who they know faces a particularly high risk of assault with a male inmate. See Doe, 215 F. Supp. 3d at 77–78 (finding jail guards ineligible for qualified immunity where they celled transgender inmate whose record indicated she should be housed alone with a male inmate and then failed to conduct proper overnight security checks). But the case leaves open what exactly a higher-level *supervisor* or *policymaker* must do when dealing not with particularized evidence of risk, but rather with the ever-present, generalized risk of sexual assault that transgender inmates face at the hands of their cellmates. In other words, Farmer does not hold that transgender female inmates, notwithstanding their own housing preferences, may *never* be celled with male inmates. In fact, Farmer says nothing whatsoever

11

about general procedures for housing transgender inmates. And, equally importantly, Farmer laid down a principle that officers who reasonably respond to known risks cannot be held liable for deliberate indifference, id. at 844, which leaves open the possibility that an official's unreasonable response was not *clearly* unreasonable under existing law.

The Supreme Court's unanimous decision in Taylor v. Barkes, 135 S. Ct. 2042 (2015), helps explain why Farmer's holding—clear as it may be with respect to certain conduct—does not automatically vitiate Smith's immunity here. In Barkes, the widow of a former inmate who committed suicide in prison had sued the commissioner of the state department of corrections and the prison's warden. Id. at 2043 (per curiam). She claimed that the officials had displayed deliberate indifference toward his risk of suicide "by failing to supervise and monitor the private contractor that provided the medical treatment—including the intake screening—at the [prison]." Id. The court of appeals had found that the officers were not entitled to qualified immunity on her Eighth Amendment claim because, at the time of the inmate's death, there were cases on the books putting officers on notice that they could not behave with reckless indifference to a particular inmate's known "vulnerability to suicide." Id. at 2045 (quoting Colburn v. Upper Darby Twp., 838 F.2d 663, 669 (3d Cir. 1988)). The Supreme Court disagreed. In its view, those prior decisions did not clearly establish the unlawfulness of the officials' purported conduct—failing to implement adequate screening procedures—because the cases "did not say . . . that detention facilities must implement procedures to identify such vulnerable inmates, let alone specify what procedures would suffice." Id.

By the same token, Farmer does not dictate the outcome here. The clearly established right to be free from deliberate indifference to sexual assault does not mean that it is clearly established what procedures a supervisor must put in place to prevent assault. And the Court

12

finds that, as a matter of undisputed fact, Warden Smith's actions did not violate clearly established Eighth Amendment law. It is undisputed that Smith played a limited role in the chain of events that led to Richardson's purported assault. He testified that he did not participate in creating or implementing the two policies that Richardson takes issue with—the one that allowed transgender inmates to be housed in the general male prison population, see Smith Depo. at 13–15, or the one that presumptively double-celled inmates, including transgender inmates, absent a specific finding that they belonged in protective custody, see id. at 21–22. Richardson identifies no evidence undermining that testimony, and indeed she concedes that the policies were instituted not by Smith, but by the Department's Director. Pl.'s Opp'n at 6, ¶¶ 6–7. Nor is there any evidence suggesting that Smith selected Glover as Richardson's cellmate or was aware of Richardson's concerns about Glover, which she claims to have expressed to several prison guards after being moved into his cell.

Rather, the record, read in the light most favorable to Richardson, supports the following narrative with respect to Warden Smith's state of mind: Smith knew that, pursuant to Department of Corrections policy, an inmate could circumvent the Transgender Housing Committee's hearing process by signing a form agreeing to be housed according to her birth sex. Defs.' Mot. Summ. J. Exs. A, B, G. Smith could override any initial determination related to housing—including the inmate's election of birth-sex housing—by making a recommendation to the Director in writing. Id. Ex. G, at 5. Smith also knew that any transgender female inmate who was housed in the general male population would presumptively be double-celled based on a suicide-prevention policy instituted by the Director. Id. at 26–27. Smith could register disagreement with that policy but could not unilaterally change it. Id. at 28. A jury could also infer that Smith knew generally that transgender female inmates—particularly those exhibiting

13

traditionally feminine characteristics—faced a higher risk of sexual assault when celled with male inmates. There is no evidence, however, that Smith had any information indicating that Richardson faced a particularly high risk of abuse. Nor is there evidence that Smith knew that Glover, beyond his substantial criminal history, posed an especially high threat of sexual assault.

Obviously, Richardson need not point to a case finding liability under that *exact* set of facts in order to overcome qualified immunity. See Hope v. Pelzer, 536 U.S. 730, 740–41 (2002). But she still must persuade the Court that, in 2014, Smith was on clear notice that the foregoing conduct and associated state of mind amounted to a constitutional violation. She cites no authority, nor is the Court is aware of any, that provided such notice. The right to be free from deliberate indifference to the risk of assault does not necessarily imply that Smith needed to categorically prevent transgender female inmates from being celled with male inmates who exhibited no particularized red flags when it came to sexual violence. And an officer in Smith's position could reasonably—not necessarily correctly, but reasonably—believe that the D.C. jail's system for housing transgender inmates properly balanced inmate safety against avoiding mandatory isolation of transgender inmates, especially because it is undisputed that the double-celling policy was enacted to mitigate the risk of suicide. Smith is therefore entitled to qualified immunity on Richardson's Eighth Amendment claim against him in his individual capacity.

### 2. *Official Capacity*

That leaves whether Richardson has pled a claim against Smith in his official capacity and, if so, whether that claim survives summary judgment.

A § 1983 claim for damages against a D.C. officer in his official capacity is, in effect, a claim against the District itself. See Graham, 473 U.S. at 166 ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other

than name, to be treated as a suit against the entity."). Municipalities, unlike their officers, have no qualified immunity from suit under § 1983. Owen v. City of Independence, 445 U.S. 622, 650 (1980). But to hold a municipality liable, the plaintiff must establish both "a predicate constitutional violation" and "that a custom or policy of the municipality caused the violation." Baker v. District of Columbia, 326 F.3d 1302, 1306 (D.C. Cir. 2003).

In other words, a plaintiff cannot hold a municipality *vicariously liable* for the constitutional violations of its employees. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691–93 (1978). She must instead prove an "affirmative link" between the violation and a municipal policy, such that the policy itself "was the 'moving force' behind the constitutional violation." Baker, 326 F.3d at 1306; see Monell, 436 U.S. at 691 ("Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."). That link could be the explicit enactment of a policy, the action or inaction of a policymaking official, or a practice "so persistent and widespread as to practically have the force of law." Connick v. Thompson, 563 U.S. 51, 61 (2011).

The defendants contend that Richardson's complaint did not put them on notice that she was challenging a District policy or practice in addition to targeting Warden Smith's individual actions. The Court disagrees. "If a complaint alleging municipal liability under § 1983 may be read in a way that can support a claim for relief, thereby giving the defendant fair notice of the claim, that is sufficient" to survive dismissal. Baker, 326 F.3d at 1307. There was fair notice here. For one, Richardson's complaint generally identified Warden Smith as a defendant in his individual and official capacities. Compl. at 1; id. ¶ 5. Her § 1983 claim in particular designates Warden Smith as a defendant and contains no language limiting him to his individual capacity. Id. at 14. And while the heart of Richardson's allegations may be that jail officials personally

15

acted with deliberate indifference, the complaint can fairly be read as alleging that their indifference was driven by a widespread custom of the Department of Corrections. Specifically, Richardson alleges that Smith and the unknown guards failed to remove Glover from Richardson's cell after she "repeatedly complained about his sexually aggressive comments and sexual assaults upon her." Compl. ¶ 51.[2] That allegation at least suggests that the District had adopted a custom of inaction in the face of inmates' expressed concerns about sexual assault. And when combined with her designation of Warden Smith as a defendant in his official capacity and the complaint's background factual allegations, the Court finds that the District was on notice that Richardson was raising a municipal-liability claim.

But that does not mean that her municipal-liability claim survives summary judgment. For it to do so, the record would need to support a finding that (1) at least one official behaved with deliberate indifference toward the risk that Richardson would be sexually assaulted, and (2) the indifference was caused by the District of Columbia's policy, practice, or custom of failing to

---

[2] In the Court's view, the complaint's allegations *may have* supported another theory of municipal liability. Again, Richardson alleges that Smith failed "to initiate a policy whereby transgender females would be housed in their own cells, an[d]/or housed with other transgenders or gay males and/or did not have a reasonable alternative to segregation that did not involve protective custody or solitary confinement in violation of PREA and in violation of Plaintiff's constitutional rights to be free from cruel and unusual punishment." Id. ¶ 52. As the Court explained, Smith himself is protected from this allegation by qualified immunity—no clearly established law required him to institute such policies. But that does not necessarily mean that the District's policies regarding transgender housing at the time of Richardson's alleged assault complied with the Eighth Amendment. Nevertheless, in defending against the contention that she did not state an official-capacity Eighth Amendment claim, Richardson focuses solely on the allegation that the District engaged in a policy or practice of turning a blind eye toward complaints about the risk of sexual assault. See Pl.'s Opp'n at 7, 26–27. The Court therefore considers her to have forfeited other routes of establishing municipal liability.

act on inmate's reported fears of assault. While the record read in the light most favorable to Richardson amply supports the first of these requirements,³ it does not support the second.

All of the evidence regarding officials' failure to heed Richardson's complaints about Glover go to her particular case—the allegation being that, despite her pleas to several employees, she was not removed from Glover's cell. The Court can find no evidence suggesting that jail guards ignored complaints so routinely that it amounted to an official policy or custom or, relatedly, that a policymaking official had "actual or constructive knowledge" that the guards would "probably violate constitutional rights" and yet did nothing about it. Jones v. Horne, 634 F.3d 588, 602 (D.C. Cir. 2011) (quoting Warren v. District of Columbia, 353 F.3d 36, 39 (D.C. Cir. 2004)) (affirming dismissal of a municipal-liability claim because the complaint was "as susceptible to the conclusion that D.C. Jail staff acted without direction in failing to address [unsafe] conditions . . . as it [was] to an interpretation that a policymaker was aware of the conditions and chose not to act"). And it is well established that "[p]roof of a single incident of unconstitutional activity is not sufficient" to impose municipal liability "unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy." City of Oklahoma City v. Tuttle, 471 U.S. 808, 823–24 (1985). If there is any such proof in the

---

³ Contrary to the District's argument, the Court's conclusion that Warden Smith is entitled to qualified immunity does not automatically defeat the first part of her official-capacity claim. In establishing that a municipality is liable for causing a constitutional violation, a plaintiff may rely on a predicate constitutional violation that has been dismissed on the basis of qualified immunity. And here, the record undoubtedly supports the existence of an Eighth Amendment claim against at least one official. Richardson testified that Glover made sexually aggressive comments toward her, that she told several guards and her case manager that she feared he would assault her, that her pleas were ignored, and that she was ultimately assaulted. That is deliberate indifference to a T.

record, Richardson has not pointed to it. Summary judgment on her § 1983 claim against Warden Smith in his official capacity is therefore appropriate.

## IV. Conclusion

The Court will therefore grant the defendants' motion for partial summary judgment as to Count Four of the complaint, which alleges an Eighth Amendment violation. It will also dismiss Count Five given Richardson's consent to its dismissal. And, Count Four being her only federal claim, the Court will remand Richardson's remaining claims—Counts One, Two, and Three—to the District of Columbia Superior Court. A separate order accompanies this memorandum opinion.

CHRISTOPHER R. COOPER
United States District Judge

Date: August 24, 2018